## COOK v. EQUITABLE BUILDING AND LOAN ASSOCIATION.

1. A building and loan association, as such organizations usually exist to-day, is a private corporation designed for the purpose of accumulating into its treasury, by means of the gradual payment by its members of their stock subscriptions in periodical instalments, a fund to be invested from time to time in advances made to such shareholders on their stock as may apply for this privilege on approved security; the borrowing members paying interest and a premium for this preference in securing an advancement over other members, and continuing to pay the regular instalments on their stock in addition; all of which funds, together with payments made by the non-borrowing members, including fines, forfeitures, and other like revenues, go into the common fund until it, with the profits thereon, aggregates the face value of all the shares in the association, the legal effect of which is to extinguish the liability incurred for the loans and advancements, and to distribute to each non-borrowing member the par value of his stock.

2. The fact that the charter incorporating such a company gives it power to enter into other business not strictly within the usual scheme of such association, does not destroy the building and loan character of the association, where there has been no attempt on its part to exercise any of such powers.

3. A member of such association who has been advanced money on his shares may undertake, in addition to paying the legal rate of interest on such money, to pay dues and premiums for such advancement on his stock; and also fines, in the event of a failure to comply with his obligation. When such dues and premiums, paid for the privilege granted the advanced member, go into the common fund of the association, and are so

applied as to aid in the maturity of the stock upon which the advancement was made, they do not constitute interest upon the money advanced, and such a contract is not, therefore, usurious.

4. The provision of the act approved October 19, 1891 (Acts 1890–1891, p. 176), as embodied in section 2401 of the Civil Code, is in effect simply declaratory of what was law before the passage of that act; and the act so construed is not violative of that paragraph of the constitution of this State which declares that "no special law shall be enacted in any case for which provision has been made by an existing general law."

5. Where such an association issues what is known as "coupon stock," which bears interest at six per cent. per annum, payable semi annually, and upon which the holder of such stock pays to the association its full face value, with the privilege, after 90 days notice, of receiving back the money thus paid for the stock, and with a like privilege on the part of the association of calling in the stock and refunding the money paid therefor, it is simply a borrowing of money by the association. Such association has power to borrow money to further the ends of its incorporation, unless prohibited from so doing by its charter.

6. This court can not consider an assignment of error based upon a refusal to allow a witness to answer a given question propounded during his examination, when it does not appear from the record in the case what was the testimony sought to be elicited by such question.

7. The fact that the jury found for the plaintiff a verdict for an amount less than what was authorized by the testimony can afford no cause of complaint to the defendant.

8. Whether the particular transaction under investigation is within the general scope of a building and loan association plan, or is a plan devised by schemers to make money for themselves under the form of building and loan contracts with the view of evading the usury laws of the State, is a question of fact for the jury.

9. The issues upon the plea of usury were fairly submitted to the jury under the charge of the court; and there was ample evidence to sustain the verdict in favor of the plaintiff. The court, therefore, did not err in overruling the motion for a new trial.

Argued May 19, 20, — Decided July 19, 1898.

Equitable petition. Before Judge Lumpkin. Fulton superior court. September term, 1897.

*A. R. Bryan, W. P. Calhoun* and *Robert Zahner,* for plaintiff in error.

*W. E. Jackson, J. Howell Green* and *Ellis & Gray,* contra.

Lewis, J. The Equitable Building & Loan Association was incorporated by the superior court of Richmond county, and among other provisions contained in its charter is the following: "The object of said association shall be pecuniary profit

for its stockholders, to encourage the savings of small sums of money, and to aid persons of limited means in obtaining homes. The capital stock of said association shall be the monthly payments on the shares of stock as fixed by the by-laws, not including the separate payments for the expenses of the association, referred to herein as the expense fund, and shall consist of five thousand shares, and said association may commence business whenever ten per cent. of said number of shares, to wit five hundred shares, shall have been subscribed, and shall have the privilege of increasing said capital stock from time to time, in the discretion of the board of directors, to an amount not exceeding two hundred thousand shares." The charter further provided, "That the expenses of the association shall not be paid out of the fund of money raised by subscription to the capital stock, but that all the expenses of this association, including the salaries of all officers and agents, shall be paid out of the separate fund to be raised for that purpose by a monthly payment to be made by each stockholder, known as the expense fund, which shall be fixed in the by-laws," etc. The charter further conferred upon the association such general powers of suing and being sued, contracting, holding real and personal property, as are usually conferred upon private corporations; and also conferred upon it the power "to act as agent or trustee for the investment and management of funds for persons, corporations, administrators, executors, guardians, and trustees." Under its charter the company was organized, and adopted by-laws which provided that the objects of the association were: "To assist its own members in saving and accumulating money, and obtaining the largest possible earnings on same, buying and improving real estate, by advancing to shareholders the maturity value of their shares, under the mutual building society plan, on terms, conditions, and in such a manner and on such security, as may be acceptable to the board of directors. To enable members of the different branches to build or purchase homes upon plans less burdensome than paying rents, to give cities and towns in which this association has an established branch the benefits and advantages of a local building and loan association, combined with the advantage of safe and

accumulative investment." The by-laws further provided for the issuing of what is known as "series stock to be paid for in monthly instalments, . . designated as Class A stock and Class C stock. The monthly payments on Class A shall be sixty cents per share, of which fifty cents shall constitute the loan fund and ten cents the expense fund. The monthly payment on Class C stock shall be one dollar per share, of which ninety cents shall constitute the loan fund, and ten cents the expense fund." This stock was issued only to investors. Other stock was also provided for, known as "loan shares," the monthly instalments on which were one dollar and twenty cents per share, of which fifty cents constituted the loan fund, fifty cents the premium fund, and twenty cents the expense fund.

Another set of by-laws was introduced, under which this loan was probably made, providing for two classes of loan shares, the monthly instalments on the same to be one dollar and twenty cents and one dollar respectively, which were to continue until payments and accumulated dividends amounted to one hundred dollars for each share in the series to which the borrower's invested stock originally belonged, when it should be declared to be matured. Under this set of by-laws, there were also two classes of investment stock, on which were to be paid monthly instalments of sixty and fifty cents per share respectively. At maturity of the serial stock, the shareholder had a right to withdraw the full face value of his stock, to wit, one hundred dollars for each share. These members also had the right to withdraw their shares before maturity, after a stipulated length of time, receiving back moneys paid into the loan fund with a stipulated interest for the average time; but the amount withdrawn should in no case exceed the book value of the stock at the time of withdrawal. Members were allowed to receive advancements upon their stock, in the nature of loans upon approved security given by them, as might be required by the board of directors. For each one hundred dollars advanced the member is required to first own two shares of Class A serial stock of the association, which, when the application, and the title to the property offered as security, are fully accepted by the association, will be assigned to the

association for half the number of loan shares, the instalments on which are to be paid as hereinbefore set forth. Provision is also made that the loan may be repaid at any time after one year, on thirty days notice, upon certain conditions, among which were, that the shares should be in good standing, there should be no arrears in interest, and the shareholder, to whom advances had been made, should be charged with the full amount of the advances, from which would be deducted the withdrawal value of his own shares. Borrowers are required to pay interest monthly, at the rate of six per cent. per annum on the actual amount loaned, according to the practice of mutual building and loan associations, these payments to continue monthly until maturity of the series to which the stock belongs, and at maturity the loan to be canceled, and the borrower possessed of full title to the property loaned on. The by-laws also provided for what is known as "coupon stock," to be sold at one hundred dollars per share (full face value), to bear six per cent. annual interest payable semi annually; the holder of this stock to have the privilege of withdrawing same upon ninety days notice in writing, receiving one hundred dollars per share for each share surrendered, with accrued interest at the rate above mentioned; the association reserving the right to call in and cancel this stock, giving the holder thereof six months notice in writing.

The testimony showed that the character of stock above designated was issued by the association; and none was issued that was not provided for in the by-laws. It further appeared from the testimony, that the loan was made to John B. Cook, the borrower in this case, for the purpose of building a house, and the money was advanced, as the house was erected, in instalments of one third each; that Cook had paid fines for 17 months, making a total of $91.80, at $5.40 per month; that he paid the admission fee, which was paid by all members, both investors and borrowers, one dollar per share; that he had paid twenty-one months instalments, twenty-seven dollars each; and the total amount paid by him was $897.30, distributed as follows: $235-.98 to the loan fund; same amount premiums; $95.04 to expense fund; $184.50 interest; $91.80 fines. John B. Cook,

who was then a member of the Equitable Building & Loan Association, procured an advance on his stock from the association, and executed to it a bond whereby he obligated himself to pay the association the monthly instalment of one dollar per share for 27 shares of its loan stock of "Class B" and of a designated series, of the par value of $100 each, and to pay interest in equal instalments, at the rate of six per cent. per annum, on $2,700, advanced to him by the association on these shares, until the shares should mature, according to the charter, rules and by-laws of the association, at which time the stock should be canceled and the indebtedness cease; also to reimburse the association for such sums as might be paid by it for insurance and taxes upon certain realty described in a deed of conveyance which, contemporaneously with the making of the bond, was executed by him to the association as security for the performance of these obligations. The association at the same time executed to him a bond to reconvey the land upon full compliance with the conditions of his bond to the association. The bond to reconvey was subsequently transferred by him, and a deed to the land made by him, to a person who in turn transferred the bond and executed a conveyance of the land to his (Cook's) wife. Cook died leaving no estate, and the association brought its petition against Mrs. Cook, praying that this land, which was then in her possession, be sold, and Cook's indebtedness to the association paid from the proceeds of the sale; Cook having made default in failing to meet his obligation under the bond.

Mrs. Cook set up in defense, that the deed from Cook to the plaintiff was void for usury, because the sums contracted to be taken for the use of the money advanced to him amounted to more than eight per cent. per annum; that the plaintiff, although nominally a building and loan association, was not one within the meaning of the law, and was not conducting its business as such; that it combined with some of the features of such an association those of corporations of a different character; and that the general scheme or plan upon which it was operated embraced usurious designs; also, that the statute providing that no fines, interest, or premiums paid on loans in any

building and loan association shall be deemed usurious (Civil Code, §2401), is unconstitutional because, there being a general law on the subject of usury, the statute referred to contravenes the provision of the constitution, that "Laws of a general nature shall have uniform operation throughout the State, and no special law shall be enacted in any case for which provision has been made by an existing general law." Upon the trial of the case the jury rendered a verdict as follows: "We, the jury, find the issues in favor of the plaintiff. We find that the property described in the petition be sold, and the proceeds, after paying the cost, be applied to the indebtedness of J. B. Cook to the plaintiff, which we find to be $1,945.40 principal, and $471.28 interest; and the balance, if any, to be paid to Mrs. Mary E. Cook, the defendant. This September 24, 1897." The amount claimed by the plaintiff was $2,838.21. The defendant moved for a new trial, upon various grounds, which motion was overruled, and she excepted. It is not necessary to set forth in detail the grounds of the motion for a new trial, as all of the issues therein presented are covered by the preceding headnotes in this case.

1. It is probable that building associations first had their origin in England about the beginning of the present century, though some authorities contend that before this period such organizations were in existence in Germany. There seems to be but little known of their early history, but they became firmly established in England about the year 1830 or 1835, and in this country some ten years later. The question of their origin, however, is a matter of but little moment, except as it may throw light upon what was the general scheme of such associations in their early history. The scheme upon which they seem to have been operated, even in the early days of their existence, contemplated the issuing of stock to their members, to be paid for in periodical instalments of small amounts. When a sufficient fund had thus been accumulated, it would be loaned to such members of the association as could give security, who would bid therefor the highest premium. The loan would be treated as an advancement upon their stock, and the premium as payment for the privilege of receiving such

an advancement; the object of the loan being to enable the member to acquire or improve a home. The profits thus arising would not be divided out among members of the association from time to time, as dividends are usually declared on stock in other corporations, but they would be held until the stock matured. The simplest form of such associations is what is known as the "terminating society," in which all the stock matured at the same time. The face value was paid to the members, and the organization thereupon came to an end. Another form with reference to the plan of issuing stock is what is known as a "serial association," where the stock is divided into series, each series being issued separately, and maturing separately. And still another form is a "permanent association," which issues its stock, not all at once, nor in series, but at any time when application is made therefor. Hence one may become a member at any time without any back payments of dues. 4 Am. & Eng. Enc. L. (2d ed.) 1003–1005. In the same work, on page 1001, the following definition is given of such an association : "A building and loan association may be defined as an organization created for the purpose of accumulating a fund by means primarily of the gradual payment of the stock subscriptions of its members in instalments due periodically, from which fund sums are to be advanced to members to assist them in acquiring land and erecting buildings thereon." That author says, "This definition is to be taken rather as descriptive of the typical building and loan association as it exists to-day than as inclusive of all forms of organization which may be denominated building and loan associations. The term has no exact legal significance which is adhered to in all jurisdictions."

A more comprehensive definition of such organizations as they generally exist to-day in this country is embodied in the following language from Thompson on Building Associations, § 2 : "The building association, as now existing, is a private corporation, designed for the accumulation by the members of their money by periodical payments into its treasury, to be invested from time to time in loans to the members upon real estate for home purposes, the borrowing members paying interest and a premium as a preference in securing loans over other

members, and continuing their fixed periodical instalments in addition, all of which payments, together with the non-borrower's payments, including fines for failure to pay such fixed instalments, forfeitures for such continued failure of such payments, fees for transferring stock, membership fees required upon the entrance of the member into the society, and such other revenues, go into the common fund until such time as that the instalment payments and profits aggregate the face value of all the shares in the association, when the assets, after payment of expenses and losses, are prorated among all members, which in legal effect cancels the borrower's debt, and gives the non-borrower the amount of his stock." A similar definition will be found in Endlich on Building Associations, § 16. These general principles as to the essential features of these organizations we have embodied in the first headnote. It perhaps does not include every form of an organization that may properly be denominated a building and loan association; but is sufficient to give a correct idea of what particular class is meant by the following words of section 2398 of the Civil Code: "The name 'building and loan association,' as used in this Article, shall include all corporations, societies, or organizations or associations doing a savings and loan or investment business, on the building society plan, viz., loaning its funds to its members, whether issuing certificates of stock which mature at a time fixed in advance or not." Applying these general principles to the facts in this case, we are brought unavoidably to the conclusion that the business of this defendant in error, as developed by its bylaws, and by the transactions in which it was actually engaged, was that of a building and loan association pure and simple, within the meaning of the laws of this State and the decisions of this court.

2. The charter in this case, in addition to the usual powers conferred upon building and loan associations, gave this association the power to sell or hypothecate securities, to improve real estate, and also to act as agent or trustee for the investment and management of funds for persons, corporations, administrators, executors, guardians, and trustees. It was contended by the plaintiff in error, that these powers were not within the

scope of a building and loan association, and that therefore this , association could not claim the privileges or rights peculiar to such corporations. In the case of *Butler* v. *Mutual Aid, Loan & Investment Co.*, 94 *Ga.* 562–3, it was. held, that as the record did not indicate that plaintiff was a building and loan association pure and simple, but on the contrary it was apparently a composite institution embracing objects not given to such associations, the plea of usury should have been entertained for investigation and determination by the jury as to whether the scheme of the institution *as a whole*, embraced usurious measures and designs. This defendant in error was organized primarily upon the plan of a building and loan association, and, so far as the record discloses, steadfastly adhered to that plan. As was decided in the case of *Hawkins* v. *Americus National B. & L. Asso.*, 96 *Ga.* 206, "The scheme of a building and loan association pure and simple is not unlawful as being a device for the evasion of the laws against usury, so long as, proceeding upon the principle of mutuality among its members, it adheres to the conduct of its business in accordance with the primary plan of its organization, and engages in no business inconsistent therewith." Even if the defendant in error had undertaken to exercise these extraordinary powers conferred by the charter, it would not necessarily have followed that its scheme, *as a whole*, embraced usurious designs, and that the loan to the plaintiff in error was infected with usury. But it does not appear that there ever was any attempt by the company to exercise such powers. The character of its transactions must necessarily be construed in the light of the purposes for which it was organized, and the business in which it is engaged, and not in the light of what it might have done under its charter.

3. It appears that Cook obtained ,on his 27 shares of loan stock an advance of $2,700, for which he was to pay monthly interest at the rate of 6 per cent. per annum, and also to pay upon the shares, which may be considered his premium money, $1.00 per month for each share. It is insisted that these charges were simply interest on money borrowed, and, aggregating more than the lawful rate of interest, amounted to usury. We can not possibly see any element of usury in the transaction.

Usury is defined by our Civil Code, § 2877, to be, "reserving and taking, or contracting to reserve and take, either directly or by indirection, a greater sum for the use of money than the lawful interest." The payment of $1.00 per month on the shares was not for the use of the money, but for the preference given to the member by advancing to him the full face value of his shares. The scheme of the contract does not contemplate that this payment should be regarded simply as *interest* on the loan. If it did, then in addition to the interest which, in this case, would have amounted to 18 per cent. per annum, the borrower would have been under certain obligation to pay the principal also. The amount paid by the borrower by way of premiums, interest, dues, etc., is not applied in extinguishment of the interest on his loan, but becomes a portion of the common fund in which he has a proportionate interest with the other members of the association. These funds, together with other dues paid by members of the association, may be again reinvested, and continue to swell the assets of the association until the stock matures, distribution is made, and advanced members are relieved of their obligations. To illustrate: Cook, in this case, by his bond, was obligated to pay $18 per year (to wit, 6 per cent. interest, and $1 per month dues or premiums), for each loan share of stock he held. The value of such share at maturity was $100. Suppose his stock should have matured in six years, then the total amount he would have paid back to the association would have been $108 for the use of $100 for six years. In other words, he would have obtained the use of the money at less than $1\frac{1}{2}$ per cent. per annum. If the stock had not matured until the end of ten years, then the total amount he would have paid back would have been $180, which would have been exactly the sum received by him with 8 per cent. interest per annum. Hence it follows that the amount paid by the borrower will depend altogether upon the success of the business of the association. This element of uncertainty which, to final settlement, leaves the borrower's rights and liabilities in doubt, and the further fact that what he pays becomes a part of the common fund, in which he has an interest, and which is used to aid in the can-

celation of his principal debt, distinguishes the transaction from an ordinary case of loaning and borrowing money. To say that this is a scheme for evading the usury laws of the State is untenable. A scheme by whom? By the association? The borrower is a member of it. • He enters into the scheme. He really occupies the duplex relation of both debtor and creditor. As was stated by Judge McCay in the case of *Parker* v. *Fulton Loan & Bldg. Asso.*, 46 *Ga.* 166–196: "In such a scheme as this, the great element of usury is wanting, to wit: oppression—advantage taken by one of the necessities of another; the person getting the money in this case being in fact interested himself in having the sales as high as possible. To permit the usurer himself to set up the usury, after the contract has been executed, would be contrary to all principle. The person wronged is allowed so to do, but not the wrongdoer, and if the plaintiff here recovers he will recover a part of the advantage which came to himself, from the high rates at which *others* sold their interest in the ultimate dividend." There is really nothing in this case to distinguish it in principle from the decision in the one just cited. This question seems to have been first discussed by this court in the case of *Bibb County Loan Asso.* v. *Richards*, 21 *Ga.* 592. The decision in the *Parker* case has been repeatedly adhered to by this court in subsequent adjudications. See *Redwine* v. *Gate City Loan & Bldg. Asso.*, 54 *Ga.* 474; *Pattison* v. *Albany B. & L. Asso.*, 63 *Ga.* 373; *Van Pelt* v. *Home B. & L. Asso.*, 79 *Ga.* 439; *Butler* v. *Mutual Aid, Loan & Investment Co.*, 94 *Ga.* 562; *Hawkins* v. *Americus National B. & L. Asso.*, 96 *Ga.* 206; *Goodrich* v. *Atlanta National B. & L. Asso.*, 96 *Ga.* 803.

The question of usury in such transactions is no longer an open one in this court; but we have dealt with it at some length, for the reason that a few learned members of the profession have doubted the correctness of the above rulings. We think they are not only sustained by reason, but they are certainly supported by a decided weight of authority both in England and in this country. In Endlich on Building Associations (2d ed.), § 341 et seq., a great number of authorities in the courts of England and this country are reviewed. Among the States

whose decisions are in accord with the rule adopted by this court are Maryland, Kansas, Tennessee, North Dakota, Massachusetts, New Jersey, Louisiana, Arkansas, Alabama, Illinois, Minnesota, Virginia, District of Columbia, Michigan, Mississippi, New Hampshire, New York, and Indiana. The only States holding the contrary view, so far as we have been able to ascertain, are North Carolina, South Carolina, Nebraska, Kentucky, Pennsylvania, and Texas. After reviewing the decisions of the Supreme Courts of these several States, including the decisions of this court, and those made in England, the above author uses the following language in section 365: "An examination of the foregoing decisions would seem to justify the conclusion that the clear weight of judicial authority declines to look upon the transaction between a building association and its advanced member as constituting a loan pure and simple. . . It may perhaps be found most nearly accurate to say that the transaction is a loan the terms of which are so vitally affected by the debtor's membership relation to the creditor society,— in the source and profits of which the debtor has himself such a substantial interest,— and the extent of his ultimate liability upon which is so contingent and uncertain at the time of its creation, that it is impossible to apply to it, in its essential features, the rules of common or statute law defining the limits of what may be bindingly assumed and lawfully exacted in ordinary transactions of borrowing and lending." The apparent hardship upon the borrower in such transactions results when he fails to comply with his obligations under his bond, and when the association then elects to stand upon its rights under its contract with him, and sue him for a breach of his obligation. Premiums and dues previously paid by the borrowing member become forfeited; but this is a hardship that results from his own default, and is no greater than what any person undergoes who takes an insurance upon his life, and by default in payment of premiums forfeits the policy together with all previous payments made thereon. This, however, can not affect the question of usury. It was held in the case of Holmes *v.* Smythe, 100 Ill. 413–422, that if the contract, carried out on both sides, results in the imposition of

interest at a legal rate, the fact that it is provided in the mortgage that the face of the loan shall be due on default of any payment, and that a power of sale is given to be exercised in that event, the happening of which would give the association a higher rate of interest, does not render the contract usurious, the excess being in the nature of liquidated damages. In perhaps most of the States there are laws regulating to some extent the business of such associations; and of course, in treating of their rights and liabilities, the courts should have regard for such statutes. Since the decision in the *Parker* case, it has, by legislative enactment in this State, been declared that "No fines, interest, or premiums paid on loans in any building and loan association shall be deemed usurious, and the same may be collected as debts of like amount are now collected by law in this State, and according to the terms and stipulations of the agreement between the association and the borrower."

4. It is insisted by counsel for plaintiff in error, that this act is unconstitutional in that it seeks by special law to enact certain things for which provision has been made by an existing general law. It is contended that the legislature can not pass a general usury law, and afterwards exempt by special legislation a certain class from its operation. We do not think the statute obnoxious to this provision in the constitution. It was not intended to legalize a charge of usury by a building and loan association. In fact the legislature simply declared to be law what this court had previously decided was law. Besides, speaking for myself, I think that advances made by building and loan associations to its members differ so materially from other loan transactions, that it was perfectly competent for the legislature to place them in a separate class for the purpose of regulating questions of usury and interest. Even if the act in question can be considered as special legislation, it contains nothing for which provision has been made by an existing general law. As before indicated, the general law in the State on the subject of usury has no application to transactions of this sort by building and loan associations. But we do not think this section of the code above quoted either a local or a special law. It is certainly not local, for it is confined to no locality,

but extends in its operation throughout the State. It is not special, because it embraces all citizens of the State, and gives to every person who may conform to its requirements the same rights and privileges. This identical question has been passed upon by the Supreme Courts of several States of the Union which have similar constitutional provisions in reference to special legislation as are embodied in the constitution of Georgia. In the case of Holmes *v.* Smythe, 100 Ill. 413, it was decided that "An act to enable associations of persons to become a body corporate to raise funds to be loaned only among its members, is a general law, applicable to all the citizens of the State who choose to bring themselves within the relations and circumstances provided for by it, and is not within the prohibition of the constitution (section 22 of article 4), which declares that the General Assembly shall not pass local or special laws 'regulating the rate of interest on money' or 'granting to any corporation, association, or individual any special or exclusive privilege, immunity, or franchise whatever.'" This case has been reaffirmed in Freeman *v.* Ottawa Bldg., Homestead & Savings Asso., 114 Ill. 182, and also in the case of Winget *v.* Quincy Bldg. & Homestead Asso., 128 Ill. 67. In the case of McLaughlin *v.* Citizens B., L. & Sav. Asso., 62 Ind. 264 et seq., it was decided that an act of that State providing that "no premiums, fines, or interest on such premiums that may accrue to building associations shall be deemed usurious," is not inconsistent with the constitution of Indiana, which prohibits the enactment of local or special laws on the subject, among others, of interest on money. This case was reaffirmed in the case of Shaffrey *v.* Workingmen's Savings, Loan & Bldg. Asso., 64 Ind. 600. To the same effect see Vermont Loan & Trust Co. *v.* Whithed, 2 N. D. 82.

5. It is also insisted in this case, that the plan of the association in issuing its coupon stock to members is entirely inconsistent with the feature of mutuality which pervades all pure building and loan associations. The holders of this stock paid the association its full face value, $100 per share, and the stock thus acquired bears interest at the rate of 6 per cent. per annum, payable semiannually. The purchaser has the right, af-

ter 90 days notice, to receive back the money paid for the stock, and the association has a like privilege, upon 6 months notice, of refunding to the purchaser the money paid therefor, and taking up the stock.   The holder of this stock has really no interest in the profits or losses of the business of the association. The association can never be under any obligation to pay him more than it has actually received from him with interest; nor can it ever discharge its obligation to him by paying him less. We can not possibly distinguish this from any other case of borrowing and lending money.   It is just as if the association had obtained money on its note or bond, due upon 90 days after demand, with interest.   It matters not what name is given to its obligation, whether stock, note, or bond; the nature of the transaction, whether it be a pure borrowing of money or not, is determined by the real substance and effect of the contract between the parties.   This gives rise to the question as to whether or not a building and loan association can borrow money, it not being, either by its charter or the laws of this State, prohibited from so doing.   As a general rule, a private corporation can incur a debt by procuring a loan of money for the purpose of carrying on its legitimate business.   We see no reason why these associations are not clothed with a like power and privilege.   From the nature of the plan of these associations it necessarily follows that in the incipiency of their organization, on account of the small and gradual payments made upon their stock, they can have for some time but a small fund upon which to operate.   To meet this, or any other emergency in its business, it may be to the interest of all its membership at times to borrow money.   Should any abuse of such power arise on the part of the officers of the association, any member thereof would have his remedy in the courts to correct it.   There is some respectable authority against this view; but as stated in 4 Am. & Eng. Enc. L. (2d ed.) 1022, "The better opinion is that there is nothing to take such associations out of the rule governing corporations generally, and that they have the power to borrow in order to further the ends of their incorporation, even though no such power is conferred by the charter or general law, or recognized in the by-laws."   In Thompson on

Building Associations, 113, § 4, it is declared: "The unquestioned weight of authority in America is to give building associations the incidental right to borrow. The question of the right to borrow is to be determined by inquiring into its objects and purposes. It has conferred upon it those incidental rights that are consistent and reasonably necessary to carry on its business. The vital question is: Is borrowing necessary to accomplish its objects? If it is, then, upon principle and authority, it may borrow." See also Endlich on Building Associations (2d ed.), § 297 et seq. A well-considered case, in which the Supreme Court of Wisconsin recognizes this right, is North Hudson Mut. Bldg. & Loan Ass'n *v.* First National Bank of Hudson, 47 N. W. Rep. 300.

6. A ground in the motion for a new trial, insisted upon by the plaintiff in error, was alleged error in the court in ruling out, on objection of plaintiff's counsel, the following question propounded by defendant: "Does your association, or has it in the past acquired any real estate in any other way than by foreclosure, or in some way which compels it to take real estate in order to protect itself?" It does not appear what would have been the answer of the witness, or even what answer was expected from him by the counsel. It is, therefore, impossible to say from the record that any harm resulted to the defendant by the ruling complained of, even if oral testimony on the subject had been admissible. See *Anderson* v. *Savannah Press Publishing Co.*, 100 *Ga.* 454.

7. Plaintiff in error further complains that the verdict was less than the evidence demanded, if the association was a legitimate building and loan society. The fact that a verdict in favor of the plaintiff was for an amount less than the evidence authorized can afford no cause of complaint to the defendant. *Clark* v. *Thompson*, 99 *Ga.* 221.

8, 9. Designing persons may undertake to reap an advantage under the principles of law governing building and loan associations; and, by pursuing forms usually adopted by such associations, may endeavor to evade the usury laws of a State. It matters not what may be the form of the contract, or the name of the enterprise undertaken; the court will always look

to the substance and spirit of the transaction, and the real intention of the parties, in reaching a conclusion as to whether or not the laws on the subject of usury have been violated. The law governing building and loan associations, in the language of Endlich, "was not intended to allow capitalists, under pretence of philanthropy, or upon any other ground, to obtain for their money a greater interest than could be got through the ordinary channels of investment." When such an issue is properly in a case, the question thus raised, under proper instructions from the court, is one of fact for the jury, as was decided by this court in the cases hereinbefore cited. In the particular case we are now considering there was not only ample evidence to sustain the conclusion that there was no usury in this transaction and that this company was doing the business of a pure building and loan association, but the record does not disclose any fact the legal effect of which tends to sustain the defendant's plea.

*Judgment affirmed.    All the Justices concurring.*