# Wytheville

LENA COHEN AND BETTY COHEN V. G. R. SWINK, RECEIVER, ETC.

June 12, 1939.

Record No. 2043.

Present, All the Justices.

The opinion states the case.

*W. R. Ashburn,* for the appellants.

*Baird, White & Lanning,* for the appellee.

BROWNING, J., delivered the opinion of the court.

This is a suit in equity to distribute the assets of an insolvent building and loan association known as the Definite Contract Building and Loan Association of the city of Norfolk, Virginia.

At this time there are no outside creditors except one whose claim is unliquidated and is not in issue in this proceeding. The contest here is between holders of certificates of membership which are sometimes otherwise designated as shares of stock, stock certificates, and the like, the various types differing in very essential and important particulars.

At an early period of the life of the association, a separate and supplementary company was formed by charter provisions, called the Atlantic Trust and Security Company, which guaranteed the maturity of certain of the memberships of the association at a definite time or fixed period after their issuance regardless of whether or not the profits justified it. Thus we have the derivation of the term "Definite Contract," a part of the name of the association.

The two corporations will generally hereafter be designated as the "Association" and the "Trust Company," respectively.

The Association appears to have been chartered in 1895 and the organization was completed in 1901. For a period of years the Association and the Trust Company did rather a phenomenal volume of business, with corresponding success. The Trust Company, whose shareholders were the directors of the Association, derived great profits from the operation of the scheme, which profits were paid out in dividends to its shareholders.

At first the Association's source of money was from the sale of memberships sold on the installment payment plan. It subsequently developed that the two allied companies could profitably use more money than that plan provided. The result was that the board of directors of the Association from time to time took appropriate steps to issue a

number of types of certificates which would meet the demands of their growing business. Out of this mode of conducting the business came loan certificates, which were designated as "full paid stock loan certificates," and "other full paid memberships," which were designated as "full paid stock" and sometimes as "full paid membership certificates." The latter character of certificate is the type owned by the Cohens, who are the appellants in this case.

The depression which began in 1929 and continued through the succeeding years, and which rocked the financial structure of the country, was the undoing of the Association and its ally. The business dwindled because of frozen and depreciated assets so that they sought and secured loans from the banks and from some of the Federal loan agencies, and in the stress of the period the Association passed resolutions and amended its by-laws and did other things of a restorative nature, but without permanent avail, until the State Corporation Commission, through its Insurance and Banking Commissioner, filed in March, 1937, a bill charging that the credits to shareholders, or members, had been or were in danger of being impaired and the Association was verily believed to be insolvent and praying that a receiver be appointed to take charge of the business for the purpose of winding it up under the direction of the court. This action was consented to by the Association, which filed its answer to the bill and the appellants intervened by petition setting forth their claims *in extenso.*

One of the steps adopted by the distressed Association to keep on its feet was the discontinuance of the issuance of any further certificates of the full paid stock or guaranteed full paid certificates, such as were held by the appellants and the abrogation of certain rights of withdrawal upon certain notice contained in certain certificates which were then in existence and those to be issued in the future.

There was then authorized to be issued a new series of certificates, which did not embrace features or rights in the holders thereof that obtained in the case of the prior issues.

The two types of certificates were aptly contradistinguished by the terms "the old certificates" and "the new certificates." The holders of the former were besought to exchange them for the latter and an intensive effort was made to that end.

About ninety percent, or a vast majority, of the holders of the "old certificates" made the exchange. Among the recalcitrants were the appellants. They here insist upon what they deem to be their contractual rights. This insistence is based upon the notion that, by virtue of the charter purposes of the Association, its by-laws and the provisions of their certificates, and certain indicia, they occupy the vantage position of creditors of the Association and its ally and have been so related from the beginning and are entitled to priority over the holders of the "new certificates" in the distribution of the assets. They urge that they have been creditors *ab initio,* not in the sense of an independent or "outside creditor," but in the purview of being related members of the corporation set-up, enjoying contractual advantages not shared by the other holders.

The pertinent charter provision of the Association is, in part, this: "The purposes for which the said Company is formed, are to purchase, hold, and sell property, real and personal; *to receive deposits and savings, to borrow money and secure its repayment by liens upon real estate or otherwise;* to assist its members in saving and investing money, by buying and improving real estate, in procuring money for other purposes, by loaning and advancing on the Mutual Building Society plan to such of its members as may desire to anticipate the ultimate value of their shares, funds accumulated from the monthly contributions of its stockholders and also such other funds as may from time to time come into its hands; and to aid persons of limited means in purchasing homes for themselves and generally to conduct the business of a Perpetual Building and Loan Association."

We note then that the Association could receive deposits and savings and borrow money. In this connection Mr.

Stansworth, the sometime secretary, secretary and treasurer, and director of the Association, was asked if its board of directors ever authorized the issuance of stock in the form held by Mrs. Cohen except as a method for the Association to borrow money from the public. His answer was: "They were authorized by the Board of Directors to obtain money, instead of getting it on the installment plan, when our receipts would be coming very slow. To make loans, Full Paid Stock was issued to some people who wanted to invest some money, instead of paying it monthly."

Thus, according to the testimony of one of the Association's most active and authoritative officials, "full paid stock" or "the old certificates" were issued to some people who wanted to invest money. Of such were the Cohens. They were investors and were, in turn, perhaps *quasi* creditors.

A very clear statement is made by the commissioner as to the circumstances which were present and influenced the parties when some of their transactions were entered into. In part, it is as follows:

"The Association desired money for the purpose of lending the same, and the other parties desired to make investments under such circumstances that they could withdraw their investments and receive their money on short notice.

"None of them wanted to buy stock. In all such cases prior to 1932, the Association's representatives told prospective purchasers that they could withdraw their money on thirty days' notice.

"For over thirty years the Association promptly met all such requests and save where the amounts sought to be withdrawn exceeded $10,000, it did not even insist on the thirty days' notice."

It will be noted that, besides the Association's charter authority to receive deposits and savings and to borrow money, its by-laws gave it like authority and allowed it to evidence loans by notes, bonds or *other obligations*. Again, Article XXVI of its by-laws provided for its protection by

the limitation that it could not be compelled to pay on account of withdrawals in a single month more than one-half of the net receipts of the Association in that month, exclusive of receipts from the sale of bonds and *paid-up memberships.* These facts were also accentuated by the commissioner to whom the case was referred for his report as to the scheme of distribution of the assets of the Association.

The pertinent sections of the by-laws of the Association are as follows:

### "ARTICLE III.

#### FULL PAID MEMBERSHIPS.

There may be issued certificates for full paid memberships of the par value $100.00 each and certificates for half full paid memberships of the par value of $50.00 each. On these certificates there shall be paid such dividends as the Directors from time to time determine."

### "ARTICLE XX.

#### LOANS OBTAINED.

All sums borrowed by the Association shall be evidenced by Notes, Bonds or *other Obligations* secured, if security is required, as agreed between the Association and the lender."

### "ARTICLE XXI.

#### SALE OF BONDS, ETC.

The Association may sell Bonds, Notes and *Other Obligations,* dated, bearing interest and made payable at such times and places and on such terms and conditions as the Directors prescribe."

### "ARTICLE XXVI.

#### WITHDRAWALS.

Any member wishing to withdraw may do so upon the condition stated in *the application for membership,* the cer-

tificate thereof and *other signed documents* and the Charter, By-Laws, Rules and Regulations of the Association, but there shall not be paid to withdrawing members more in the aggregate, in any one month, than one-half the Association's net receipts during that month, *exclusive of receipts from the sale of bonds and paid up memberships,* unless, in the judgment of the Board of Directors, it is wise and prudent to do so."

On July 25, 1933, the Association amended its by-laws by adding to Article XXVI a provision suspending the right of any member who did not give notice on or before July 1, 1933, to withdraw the cash value of his investment shares until the board of directors authorized further withdrawals, and providing further that any member who did not give such notice could not withdraw from the Association until he had given at least six months notice of such intention and on account of the present emergency the time of withdrawal was extended for six months from July 1, 1933, and the Association reserved the right to further extend the time if, in the opinion of the board of directors, existing conditions required such action.

The material parts of the "full paid membership guaranteed certificates" are as follows:

### *Face of Certificate.*

"This Certifies that of County of State of is a member of the DEFINITE CONTRACT BUILDING & LOAN ASSOCIATION of Norfolk, Va. and has subscribed for and is the owner and holder of Full Paid Shares of stock therein of the par value of ONE HUNDRED DOLLARS per share, amounting to Dollars, for which he has paid the full par value thereof. This Certificate is issued to and accepted by the holder, subject to the By-Laws of said Association, and terms and conditions printed upon the back hereof."

"TERMS AND CONDITIONS.

"1st. The holder hereof shall be entitled to receive dividends at the rate of 6 per cent per annum, payable on the first day of January and July of each and every year this Certificate is in force; and if this Certificate be withdrawn between dividend days the holder shall be entitled to receive dividends from the last dividend day until the time of withdrawal.

"2nd. This Certificate may be withdrawn by the holder at any time after thirty days, upon thirty days' written notice, and may be called in by the Association at any time after three years, upon payment to holder of the par value of each share herein and dividends as above set forth, but if withdrawn any time prior to six months from date no interest will be allowed."

The three "old certificates" which were held by Mrs. Lena Cohen, which aggregated $6,200.00, were acquired in 1931 and on June 2, 1932. The "old certificate" held by Miss Betty Cohen for $300.00 was acquired by her from the Association on July 2, 1932.

In the year 1932 the Legislature enacted the Building and Loan Code, Acts 1932, chapter 102, and section 13 thereof gave Building and Loan Associations the right to establish rules governing withdrawals and payment of matured shares and the further authority to fix the period of notice required for withdrawals and to extend the notice period in emergency. It fixed the relationship between the Association and its shareholders as that which usually exists between a corporation and its shareholders, and it further provided that, in the event of an emergency preventing the payment of withdrawals of shares in the usual course, the shareholder would not be privileged to claim and establish a debtor-creditor relation in lieu of the usual privileges of a shareholder.

It will be seen that the effective date of this statute was subsequent to the issuance dates of Mrs. Cohen's three cer-

tificates referred to, as was the case of the amendment to the by-laws of the Association.

In 1932 the Association realized that it had outstanding and subject to withdrawal and payment a large number of "old certificates." This was a condition which might produce an alarming situation. It might be called upon, at any time, within the conditions of the certificates and by-laws, to pay out a large amount of withdrawal demands without having sufficient funds devoted to that purpose. Like every well going and well ordered business concern of its nature, its funds were invested so as to afford income sufficient for its current needs, to say nothing of profits for the venture.

It may, at this moment, occur to the thoughtful that the withdrawal provision of the by-laws limited its operation to a certain portion of the Association's net receipts during the month of withdrawal, with certain exceptions, and, therefore, the structure was protected. The answer, however, is that the Association never segregated its incoming monies, and never defined "net receipts," and failed utterly to take advantage of the protection which was afforded by its own by-laws. The record abundantly shows that it continued to pay withdrawal demands up to $10,000 in amount without requiring any notice, oral or written, and thereby, we think, waived the giving of notice as a prerequisite to the right of withdrawal. This effect, probably, also ensued when importunate members seeking to withdraw, without having given previous notice, were told that the denial of their demands was because withdrawals had been suspended. Their failure to give notice was not suggested, and, therefore, it might be held to have been waived.

We have hereinbefore referred to a debtor-creditor relation with the Association because that has been rather stressed, one way and another, in the briefs and in the report of the commissioner, to whom the case was referred for the purpose of reporting upon the claims of the appellants and the others who held a variety of types of forms of certificates, which were issued by the Association, and

their status in relation to each other and the Association. We do not perceive that it is necessary for us to determine whether or not the appellants were creditors and, if so, were they such *ab initio,* or *quasi* creditors after the maturity of their withdrawal notices, during the solvency of the Association, or were members of the Association, or stockholders of different classes.

We do know that Mrs. Lena Cohen had money which she wished to invest and that she sought the Association for that purpose and that she placed on the counter, as it were, $6,200.00 in cash and received certificates which assured her of the bounden obligation and duty of the Association to pay it back to her with interest at the rate of six per cent per annum, inartificially called dividends, upon the performance by her of certain conditions contained in the certificates and the by-laws. She executed the conditions. The commissioner, in his able and comprehensive report, fixes the date of her withdrawal notice as of July 1, 1936. This appears to be founded upon the evidence and we adopt it as the true date. Certainly, it approximately is. The relationship between herself and the Association was a contractual one of high solemnity because it invoked confidence and trust. It created in her a complete, consummate and vested right which could not be impaired, without her consent, except perhaps under the force of a legal mandate induced by a public exigency or emergency of extraordinary moment.

Much has been said about the peculiarities of the Building and Loan Association. In the family of corporations it is a hybrid and the particular Association issued a variety of shares and certificates and commitments under the guise of its being. Now that it has ceased to be and its assets are to be distributed among those entitled thereto, it becomes the duty of this court to determine, at least, the rights of the appellants. We concede that it would be the height of injustice for the appellant, Mrs. Lena Cohen, to be preferred in such distribution, if she had remained quiescent and had failed to carry out the conditions which would put

her in a place of vantage. If she had waited until the liquidation suit had been filed, in which it was charged that the Association was insolvent, and hastened then to assert her rights, the doors of equitable relief would have been rightly closed. This is not the case. The solvency of the Association is stoutly questioned by the appellee and he has sought to throw about it a mist of doubt which is said to extend back through the years. Certainly, it is said, such a state existed in 1935. For our part we doubt if the Association has ever been insolvent. It was always able to borrow money for its purposes, whether from the banks or from the Federal government, or elsewhere, it matters not. It paid its debts. It paid numerous withdrawal demands under the "old certificates." It paid many other of its corporate obligations and now it has very nearly enough of funds and property to pay everyone in full and it is the transferee, or assignee, of the capital stock of the Trust Company, which is admitted to be a substantial asset, the only reservation on the part of the Trust Company being the dividends to which it may be entitled. This happy state of affairs accounts for the intimation found in the record that the result of this suit will not be of great moment.

In 1932 the Association was frightened, as we have before mentioned, by the idea that it might be embarrassed by members seeking withdrawal of their funds. Under its by-laws that were then amended and resolutions of its board of directors it issued a new certificate of membership which does not contain the same withdrawal features upon the same notice period as are embraced in the "old certificates" and which made the maturity of the withdrawal rights dependent upon the will and pleasure of the board of directors. A hurry call went out to the "old certificate" holders asking them to exchange their certificates for the new ones. As it has been suggested, about ninety percent of them responded affirmatively. About ninety percent of the holders of certificates carrying absolute and vested rights were exchanged for a new species of security which clothed the Association with advantages and control which had not

theretofore existed. This placed, of course, the holders of the "new certificates" in a different class and relation from that which they had previously occupied. In their old status they could only derive a profit of six per cent. In their new, they stood to enjoy such profits as would be earned by the Association, however large they might be. This they evidently evaluated as a substantial consideration. They now contend, through the receiver, that they are entitled to share equally with the holders of the certificates of the character of those which they traded away.

 The learned chancellor, for whose judgment we have great respect, overruled the report of the commissioner and held that when insolvency overtakes the company the rights of the members and stockholders must be governed by the "supreme rule of equality and mutuality." This is undoubtedly the case as among the holders of the "new certificates," but their contracts are not now at all identical with those of the holders of the "old certificates," among whom is the appellant, Mrs. Lena Cohen. When the differences in their contractual relations are noted, the application of the "supreme rule of equality and mutuality" would be abortive of the principle and it would be destructive of itself. Equality, as equity perceives it, cannot be had by taking the rights which one has for the benefit of another who is not entitled to enjoy them. Equality without justice is non-existent.

The case of *Andrews* v. *Roanoke Building Association and Investment Co.*, 98 Va. 445, 456, 36 S. E. 531, 532, 49 L. R. A. 659, dealt with a situation involving some of the same principles which we have here. The eminent Judge Keith, President of the court, wrote the opinion, and he quoted with approval from two outstanding authorities upon the subject, as follows:

" 'The right of members to presently withdraw deposits is practically limited to funds on hand. And the withdrawing member must show that there are funds for that purpose before he can enforce his demand, but it is an abuse of discretion for the directors to invest the entire funds in real

estate so as to leave none applicable to the payment of withdrawing members, and thus defeat their rights. When notice of withdrawal is given the association, it should arrange the disposition of its receipts so as to meet its payments when due. While the right to withdraw is only grantable out of funds designated for that purpose, it is not intended that rightful lack of funds shall defeat the right as against the members. So, if the association is solvent, and a member gives notice of withdrawal, and the notice had matured before the association is being wound up, he is entitled to be paid out of the assets, after outside creditors, in priority to those members who had not given notice, notwithstanding the fact that after he had given the notice there were no funds for payment. The intention of the rule is to prevent the application of the funds to withdrawals to such an extent that its operations will be crippled; and when it winds up, the reason of the rule does not apply, which readily defeats the application of the rule itself.' Thompson on Building Associations, chapter 8, section 13.

"It is said in Endlich on Building Associations, 2d edition, section 514, where the demands of all the members of such a corporation cannot be paid in full, there are ordinarily several classes advancing contradictory claims—'towit, members who have given notice of withdrawal, and the period of whose required notice may have expired before the proceedings to wind up were instituted, and members who have given no such notice. * * * The tendency of the English courts, whilst recognizing that a withdrawing member is not a creditor of the association in the ordinary sense of the word, has been to allow them a preference supposed to be based in the rules of the society over those who have given no withdrawal notice.'

"In *Sibun* v. *Pearce,* L. R. 44 Ch. Div. 354, Lindley, L. J., says of the position of one who has given notice of withdrawal, but has not received payment, 'that he is not an ordinary creditor is plain. He cannot come into competition with outside creditors. On the other hand, as between himself and the continuing members, he is entitled to be paid

the amount due to him before they can divide the assets. In that sense he is a creditor, though he cannot take part in the affairs of the society.' "

The case of *Gross* v. *Citizens Mutual Building Ass'n,* 168 Va. 119, 125, 190 S. E. 298, 301, is also one partially in point. Its facts are dissimilar, but some of the principles announced are applicable. This court, through Mr. Justice Gregory, said as follows:

"The clear implication from the language used in the statute is that in the absence of an emergency preventing the payment of withdrawals in the usual course, then the shareholder is not prevented from establishing a debtor-creditor relation. As long as a member continues his payments he is a shareholder but when he voluntarily ceases to make them and requests that he be allowed to withdraw the money he has paid in, he then has exercised an option granted him of transferring his status from that of a stockholder to that of a creditor, provided the withdrawals can be paid in the usual course and no emergency exists. The statute contemplates a change in the status of a member. As long as no "outside creditor" is prejudiced, certainly an association which, through one of its officers, induces one to become a member under the representation that he can withdraw at any time, is not in a position to object to his withdrawal. The verdict in favor of the plaintiffs in this case is conclusive that they were assured by the secretary of the defendant that they would be permitted to withdraw their money at any time upon 30 days notice.

"The defendant here is solvent. It has creditors but no creditor is here objecting to the withdrawal by the plaintiffs. In fact the creditors knew before they became such that withdrawals, like the one sought here, would be made from time to time. They had knowledge of the statute and the by-laws. The by-laws authorized the defendant to permit withdrawals. They also had knowledge of the general custom and plan of the building and loan association to allow withdrawals. Therefore, it is immaterial whether plaintiffs be called stockholders or creditors. If they are

the former, then they enjoy not only the benefits of an ordinary stockholder but they also are expressly granted the additional right to terminate that relation, upon notice, and to withdraw the money paid on the stock.

"In *Andrews* v. *Roanoke Building Association & Investment Company*, 98 Va. 445, 36 S. E. 531, 49 L. R. A. 659, a general creditor's suit was instituted against the association. To the bill, a demurrer was interposed and a plea of the statute of limitations was filed. Upon these pleadings and in the absence of any evidence, the cause was heard. The court held that the bill stated a good cause of action. The court recognized the right of a withdrawing member to withdraw his money and also that it was the duty of the directors of the association to provide a fund from which withdrawals could be made. However, the court held that in insolvency the withdrawing member would not be allowed to compete with 'outside creditors.' "

It will be noted that in the case cited the *Andrews Case, supra,* is quoted with approval.

▇ The case of *Cashen* v. *Southern Mutual Building & Loan Ass'n,* 114 Ga. 983, 41 S. E. 51, presents a state of facts so nearly precisely like those in the case in judgment that we shall quote rather copiously from it:

"One who purchases from a building and loan association 'fully paid stock,' upon which he is to receive a 'guaranteed dividend' at a named rate per cent, payable at fixed times, and who is not entitled to 'participate in further profits,' is, though his right to demand payment is not to become absolute until he shall, after the expiration of a stated period, have given a specified notice, nor until there shall be in the treasury of the association a sufficiency of assets derivable from a designated source to pay him in full, in all substantial respects a creditor of the association, and entitled to be dealt with as such in an equitable distribution of its assets; and this is so, without regard to the above-mentioned conditions as to payment, if such distribution be brought about without fault on the part of the holder of such 'stock'.

"The reasoning of Mr. Justice Lewis in the *Cook Case* [*Cook* v. *Building & Loan Association,* 104 Ga. 814, 30 S. E. 911] demonstrates, we think, that the true relation between the holder of a certificate like that now under consideration and the association is neither more nor less than that of creditor and debtor. Under the contract between Cashen and the Southern Mutual Building and Loan Association, it owed him $650.00 as a loan, the interest on which was payable semi-annually at fixed times, to-wit, January 1st and July 1st of each year, at the designated rate of seven per cent. He had no interest in the profits of the association, and was not concerned as to its losses, save only as they might impair its ability to meet its obligation to him. It makes no differences that he was termed a 'stockholder,' and that his interest was designated as 'stock'. The law cares nothing for mere names. It looks to the substance of things. In this connection, it is important to remember that fully paid up stock in a building association is really an anomaly. Strictly speaking, there can be no such thing, for the moment stock is matured (that is, brought to its par value) the holder thereof is entitled to his money, and his connection with the association ceases. As will have been observed, one of the By-Laws provides that 'each shareholder shall be entitled to one vote for every share held by him or her, either in person or by proxy, at any regular or called meeting.'

"It was thereupon insisted that Cashen must be a stockholder because he had the right to vote his stock in the meetings of the association. This depends, at last, upon whether he was a shareholder or not. It will be noticed that his certificate does not in terms, confer any voting privilege or right. It evidences his true relation to the association, whatever that was, and does nothing more. If this relation was that of shareholder, the By-Law from which we have just quoted applied to him. If he was not a shareholder, it did not. Its existence, therefore, adds nothing to and detracts nothing from the argument on either side of the question.

"It was argued that Cashen's claim against the association could not be treated as a debt, for the reason that it had no fixed maturity. Under the By-Laws it was within the power of the association to mature his claim, at its option, at any time after the expiration of three years, or it was the right of Cashen, at any time after the expiration of one year, on sixty days' notice, to demand payment of his certificate. It will not do to say that a demand is not a debt merely because the time of its payment depends upon stated contingencies; nor is it fair to Cashen to defeat his claim as a creditor because he failed to give the sixty days' notice required by the By-Law. This he could not possibly have done, because very soon after he received the stock the assets of the association were placed in the hands of receivers. Surely it would never do to hold that, because Cashen was thus prevented from exercising the right given him by his contract, his true relation to the association was, without fault or negligence on his part, completely altered, and that, as a consequence, he was placed in a position less advantageous than he otherwise would have occupied. It was also urged that as the claim of Cashen was payable only out of particular assets, to-wit, not exceeding one-half the premiums paid in monthly by borrowing members, unless by consent of the directors, a greater portion of such premiums could be thus appropriated, he could not be regarded as a creditor, without showing that at the time of demanding payment the assets derivable from the source indicated were on hand and ready for disbursement. We cannot assent to the correctness of this contention. A claim payable out of particular assets when realized is none the less a debt because at a given time such assets may not actually be in the debtor's hands. A creditor in this position simply holds a demand, with conditions as to the manner in which it is to be discharged. We are prepared to admit that, if the association had remained a going concern, Cashen could not, even after the expiration of a year, and after giving the required notice, have maintained an action at law for the recovery of his claim or debt without showing that at

the time of bringing suit there actually was in the company's treasury enough from the sources indicated to pay him in full. But it is, we think, equally true, that he might, by instituting a proper equitable proceeding, have obtained a decree impounding assets liable for the payment of his certificate until enough for this purpose could be realized by the association. He was, at the time of entering into the contract evidenced by that certificate, either a creditor, or he was not. If a creditor, the suspension of business by the association, whether voluntary or enforced, could not change his relation to it. If he began as a creditor, he remained one to the end; and when a court of equity undertook to wind up the business and distribute the assets of the association, Cashen was entitled to be dealt with from the standpoint fixed by his contract."

See *The Matter of National Building Loan and Provident Ass'n* (1919), 12 Del. Ch. 93, 107 A. 453; *State ex rel. Gray* v. *Phoenix, etc., Ass'n,* 86 Mo. App. 301, 309; *Griffin et al.* v. *White, and Magnolia Camp W. O. W. No. 28* v. *White,* 182 S. C. 219, 189 S. E. 127; *Wilson et al.* v. *Parvin et al.* (C. C. A. 6), 119 F. 652, and cases therein cited; *Blunt* v. *Mercantile Railway Building & Loan Ass'n,* 115 Va. 6, 78 S. E. 554.

■ The contention of the applicability of section 4167 (13) which we have already referred to is untenable. We think that it cannot be successfully urged as deleteriously affecting the rights of the appellant, Mrs. Lena Cohen, the holder of "old certificates".

■ The same observation, for the same reasons, may be made as to the amendment of the by-laws of the Association subsequent to the issuance of the "old certificates".

■ We quote from *Thompson on Building Associations,* Second Edition, page 95, sec. 56: *"Retroactive By-Laws.* The by-laws of the Association cannot be made to operate in a retroactive manner. It is a fundamental doctrine of our American institutions that no *ex post facto* law, nor any law impairing the law of contracts, shall be passed by any of the states, and, as a matter of course, the corporation

which is created by the state has no more power than the state itself; therefore, the state being forbidden from enacting such laws, a corporation organized by the state could not make any law or rule governing its members which would conflict with such inhibitions imposed upon the state itself; and framing the by-laws for the government of financial institutions which would act in a retrospective manner would undoubtedly be void. * * * "

*Idem,* section 157: *"Change of By-Laws.* The right of withdrawal is a vested right and cannot be impaired by a changed by-law. * * * "

In the case of *Citizens Mutual Building Ass'n* v. *Edwards,* 167 Va. 399, 189 S. E. 453, Mr. Justice Eggleston writing the opinion, section 4167(17), as amended by the Acts of 1934, chapter 142, page 217, was held to be unconstitutional as offending in a manner similar to that of the section we have been discussing.

See *Coombes* v. *Getz,* 285 U. S. 434, 52 S. Ct. 435, 76 L. Ed. 866; *W. B. Worthen Co.* v. *Kavanaugh* (1935), 295 U. S. 56, 55 S. Ct. 555, 79 L. Ed. 1298, 97 A. L. R. 905; *Treigle* v. *Acme Homestead Ass'n* (1936), 297 U. S. 189, 56 S. Ct. 408, 80 L. Ed. 575, 101 A. L. R. 1284.

It follows from what we have said that, in our opinion, the three "old certificates," aggregating $6,200.00, held by Mrs. Lena Cohen have priority as to payment over any holder of any of the "new certificates," and also priority over the holders of "old certificates" who did not give notice of withdrawal. As there are no "outside creditors" it is not necessary for us to say more about the debtor-creditor relation. We hold that her $3,000.00 certificate, which is of the "new" type, should share pro rata with those holding like certificates. We further hold that the "old certificate" for $300.00 held by Miss Betty Cohen is not entitled to priority for the reason that it was issued after the effective date of the statute which we have quoted. It is on a par with holders of the "old certificates" who did not give notice of withdrawal. We hold that in the absence of any provision in the by-laws prescribing the order of payment that,

as among themselves, the holders of the "old certificates" who gave such notices of withdrawal are entitled to payment in the order in which such notices were given. As among holders of the "old certificates" who did not give notice of withdrawal and the holders of the "new certificates" who received them in exchange for their "old" ones, and stood to profit to the degree that the Association was successful in its operations, we hold with the chancellor that the supreme rule of equality and mutuality obtains and they share alike.

We may say here that, in our opinion, a critical analysis of the case of *Colin* v. *Wellford,* 102 Va. 581, 46 S. E. 780, 102 Am. St. Rep. 859, cited by the appellee and by the chancellor is inapposite to serve the purpose for which it is quoted.

We reverse the decree of the chancellor in part and affirm it in part, as is indicated herein, and remand it to the trial court to be proceeded with as it may be advised with due regard to the expressions contained in this opinion.

*Reversed in part, affirmed*
*in part and remanded.*